UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

ANTHONY DINGLE,

              **Plaintiff,**

      - against -

THE CITY OF NEW YORK,
THE NEW YORK CITY HOUSING
AUTHORITY, and
DEMETRICE GADSON, in her individual
capacity,

           **Defendants.**

------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**OPINION AND ORDER**

**10 Civ. 4 (SAS)**



I.    **INTRODUCTION**

      Anthony Dingle brings this action against his employer, the City of

New York,[1] the New York City Housing Authority ("NYCHA"), and his

supervisor, Demetrice Gadson, for claims arising under section 1983 of Title 42 of

the United States Code ("section 1983"), state common law, and section 75-b of

---

       [1]     On February 4, 2010, Dingle withdrew his claims against the City of
New York. *See* Stipulation of Dismissal for Defendant the City of New York
(Docket No. 5).

the Civil Service Law of New York ("section 75-b").[2]  Dingle alleges that the

NYCHA and Gadson retaliated against him in violation of his First Amendment

right to free speech, violated his due process liberty interest in freedom from

stigmatization, defamed him, and took adverse actions against him as a result of his

disclosure of a public health and safety violation.  Defendants now move for

judgment on the pleadings.  For the reasons discussed below, Defendants' motion

is granted in part and denied in part.

## II.   BACKGROUND[3]

Dingle has worked for the NYCHA, "a public authority created to

build, operate and maintain public housing for low-income tenants of the City of

New York,"[4] since 1990.[5]  He became a superintendent in 2004, and first met

Gadson, a deputy director in NYCHA's Manhattan Management Department,

---

[2]    Dingle originally brought claims under sections 740 and 741 of the
New York Labor Law. *See* Complaint ("Compl.") ¶¶ 109-113. He has since
abandoned these claims. *See* Dingle's Memorandum of Law in Opposition to
Defendants' Motion for Judgment on the Pleadings ("Opp. Mem.") at 16.

[3]    The following factual allegations are accepted as true for purposes of
this motion.

[4]    Memorandum of Law of Defendants in Support of Their Motion for
Judgment on the Pleadings ("Def. Mem.") at 4.

[5]    *See* Compl. ¶ 9.

-2-

when she became his supervisor in 2006.[6]  Dingle started working at his current

location, the Polo Grounds Towers in Manhattan, on February 14, 2007.[7]  As a

superintendent, Dingle

> is responsible for oversight of the clerical work, mechanical and
> janitorial departments within the Polo Grounds.  He is responsible
> for resolving issues including leaking pipes, broken locks, defaced
> walls, and cracked flooring.  He disciplines the staff at the Polo
> Grounds and doles out their assignments.  He helps ensure that the
> myriad clerical work required for the operation of [a NYCHA]
> building is timely and properly filed.[8]

Dingle initially related his belief that there are too few NYCHA

employees at the Polo Grounds on June 8, 2007, in an email requesting overtime

"to deal with the over burdensome workload Gadson was requiring Mr. Dingle to

do and to complain about being understaffed."[9]  On June 20, 2007, Dingle sent an

email to three higher-level employees in the NYCHA, stating that he needs

supervisory assistance to meet his deadlines.[10]  He alleges that "in retaliation for

his speaking out, [he] was given a multi-page list of tasks that needed completion

---

6       See id. ¶¶ 11(n), 12; Answer ¶ 7.

7       See Compl. ¶ 13.

8       Id. ¶ 15.

9       Id. ¶ 16.

10      See id. ¶ 18; Answer ¶ 18.

-3-

per Gadson's orders."[11]  He also alleges, in general terms, that the "understaffing of

the Polo Grounds posed a danger to the health and safety of residents and their

guests . . . and [he] spoke out about these issues continuously and frequently

. . . ,"[12] and that Gadson continued to retaliate against him based on his actions.[13]

On August 14, 2007, Gadson instructed Helen Itzkowitz, a manager

with the NYCHA, to issue a counseling memorandum against Dingle for failing to

adequately monitor apartment move-outs.[14]  Dingle attributes this to retaliation.[15]

He further alleges that Gadson had Itzkowitz reissue a counseling memorandum

for retaliatory purposes on September 20, 2007, after Dingle met with Gadson and

another supervisor to discuss "chronic understaffing, the onerous and harassing

nature of his relationship with Gadson, and . . . his right to speak out about issues

that affected the health and safety of the public at the Polo Grounds."[16]

Additional allegations of retaliation by Gadson based on Dingle's

continuous remarks about understaffing include disparate treatment in disciplinary

---

[11]    Compl. ¶ 21.

[12]    *Id.* ¶ 24.

[13]    *See id.* ¶ 25.

[14]    *See id.* ¶ 26.

[15]    *See id.* ¶ 25.

[16]    *Id.* ¶ 28; *see id.* ¶ 29.

action and assignment of duties,[17] Gadson's denial, without explanation, of Dingle's request to be transferred to a location in the Bronx to better handle his son's disability,[18] verbal harassment via email,[19] reassignment of Dingle's subordinate employees while he was away on vacation,[20] excessive disciplinary liability for infractions committed by his subordinates,[21] unwarranted counseling memoranda,[22] and increased workloads under a reduced support staff (and consequent counseling memoranda for failure to complete such workloads).[23]

After Dingle emailed Robert Knapp,[24] complaining about a hostile

---

[17]   *See id.* ¶¶ 30, 54-59, 69(d).

[18]   *See id.* ¶¶ 31-35.

[19]   *See id.* ¶¶ 40-41, 69(i).

[20]   *See id.* ¶ 69(a).

[21]   *See id.* ¶ 69(l).

[22]   *See id.* ¶¶ 69(m) (Counseling Memorandum dated April 17, 2009, for Dingle's failure to make specific repairs. Dingle had actually made the repairs when requested. By the time Gadson inspected the repairs after a significant lapse of time, vandalism had destroyed much of Dingle's work), 69(n) (Counseling Memorandum dated May 4, 2009, because Dingle failed to be present when maintenance staff drilled out an apartment due to flooding. However, a NYCHA manager improperly instructed the workers to execute the drill-out while Dingle was at lunch).

[23]   *See id.* ¶¶ 46-49, 69(b), 69(f), 69(g).

[24]   Neither party specifies Knapp's exact position but it can be inferred that he had authority over both Dingle and Gadson. Regardless, his title does not

work environment, Knapp held a meeting with Dingle and Gadson in early February 2008, but no remedial action was taken against Gadson, as she denied all allegations of retaliation.[25]  On February 20, 2008, Dingle complained about a hostile work environment to the Union Office.[26]

Dingle alleges that Gadson and the NYCHA further retaliated against him because he accused Gadson of violating both the NYCHA "Standard Procedures" and the law (specifically, the Fourth Amendment), and endangering public health and safety.[27]  One such violation occurred on December 29, 2008, when "Gadson directed a secretary to open a safe for her in Mr. Dingle's absence," contravening NYCHA policy that "dictates that a [m]anager be present when a safe is opened."[28]  Another allegation states that, in February and April 2009, Gadson authorized the "illegal entry into apartments by drilling out locks on apartments whose tenants were not paying rent"[29] by "generating false 'gas leak' reports or

_____

materially affect this Court's opinion.

[25]    *See id.* ¶¶ 42-45.

[26]    *See id.* ¶ 50.

[27]    *See id.* ¶¶ 60-65.

[28]    *Id.* ¶ 66(a).

[29]    *Id.* ¶ 64.  NYCHA's procedures require that "[t]he only circumstance under which such an apartment with delinquent rent payments can be entered is when the door to the apartment is unlocked."  *Id.* ¶ 62.

-6-

just improperly drilling out apartments that she unilaterally, and in contravention to policy categorized as abandoned."[30]  Moreover, on April 1, 2009, Gadson instructed Dingle to store seven unused refrigerators at the Polo Grounds, although this location "is not equipped to properly store seven (7) refrigerators . . . ."[31]

In addition to reporting these violations to "various [NYCHA m]anagers,"[32] Dingle specifically discussed these issues with the NYCHA's Department of Equal Opportunity ("DEO") on May 7, 2009.[33]  On May 11, 2009, the DEO informed Dingle "that they do not have jurisdiction regarding his issue . . . ."[34]  On June 30, 2009, Dingle filed a complaint with the NYCHA Inspector General's office "about Gadson's mandates to commit and sanctioning [sic] of illegal activities."[35]  Dingle is not aware of any action taken by the Inspector General's office addressing this complaint.[36]

After Dingle's reports, discussions, and complaints concerning

---

[30]    *Id.* ¶ 65.

[31]    *Id.* ¶ 66(b).

[32]    *Id.* ¶ 69.

[33]    *See id.* ¶ 67; *see also* Answer ¶ 67.

[34]    Compl. ¶ 67.

[35]    *Id.* ¶ 68.

[36]    *See id.*

Gadson's violations and the unresolved understaffing problem, Gadson continued

to allegedly retaliate against Dingle by, inter alia, issuing more unfair counseling

memoranda[37] and serving him with a Notice of Local Hearing a day before he was

to leave for a vacation.[38]

In one instance, Dingle alleges that Gadson's behavior was

"misleading and defamatory."[39]

> On or about July 13, 2009, Gadson . . . found there was no
> Supervisor of Caretakers on duty [at the Polo Grounds]. Thomas
> Aviles that [sic] Supervisor of Caretakers of Technical Services

---

[37] *See id.* ¶¶ 69(o) (Counseling Memorandum dated June 15, 2009, for failing to order material requested on May 28, 2009, despite only being at work for one and a half days between May 27, 2009 and June 8, 2009), 73 (Counseling Memorandum dated July 8, 2009, for "allowing a summer youth worker to stay past his work hours and giving him access to the computer system," although "Gadson herself used the youth workers in this capacity"), 77 (Counseling Memorandum dated August 26, 2009, "for his failure to ensure that the fire extinguisher contractor properly inspected all fire extinguishers" although "his signature was merely to authorize the document for forwarding." Gadson did not allow Dingle to issue counseling memoranda regarding this occurrence to his subordinates), 91 (Counseling Memorandum dated November 17, 2009, resulting from a "heated discussion" between Dingle and Gadson concerning an illness coverage question); *see also* Affidavit of Anthony Dingle ("Dingle Aff."), attachment to Opp. Mem., ¶¶ 11 (Counseling Memorandum dated November 5, 2009, for failure to correct problems "which would have arisen after working hours from the evening before."), 12 (describing the November 17, 2009 Counseling Memorandum as based on false allegations of violent language and behavior).

[38] *See* Compl. ¶ 72 ("A Local Hearing is the first step toward stripping [a NYCHA] employee of his position.").

[39] *Id.* ¶ 74.

had previously told Mr. Dingle that Mr. Torres would be covering that slot in the schedule.  Torres in fact was not on duty at this time, however, there were two (2) Assistant Superintendents [sic] workers, who were Torres' supervisors [sic] were on duty at the Polo Grounds when Gadson arrived.  Gadson sent an email to Knapp and other Administrators stating that she had to call in a supervisor to cover for the day.[40]

On August 26, 2009, "Dingle sent an email to request Local 237 Representative Ramilda Ferguson . . . to attempt [sic] set up a meeting with Knapp.  Mr. Dingle was told by Ferguson that Knapp refused to meet them regarding Mr. Dingle and Gadson."[41]

A Local Hearing was held on September 16, 2009.[42]  The charges against Dingle were "Incompetency and/or Misconduct for the February 2009, and March 5, 23, 2009 and April 17, 2009 Disciplinary Memoranda.  Arbitration on this matter is as yet pending."[43]

Dingle filed suit in this Court on January 4, 2010.  Dingle alleges that he suffered from, inter alia, vomiting, stomach pains, and a bleeding prostate — all resulting from a stressful working environment created by Gadson.[44]  Defendants

---

[40]    *Id.*

[41]    *Id.* ¶ 79.

[42]    *See id.* ¶ 82.

[43]    *Id.*

[44]    *See id.* ¶¶ 70-71, 88-89.

answered on April 16, 2010, asserting, inter alia, defenses of qualified immunity

and failure to adequately allege municipal liability.[45]

    In an Affidavit attached to his opposition brief, Dingle further

contends that after he filed suit in this Court on January 4, 2010, Gadson, in

retaliation, "attempted to put into the process the mechanics to permanently

terminate" him by setting up a Local Hearing on February 17, 2010, for an

incompetency charge.[46]  Dingle states, in his Affidavit, that

> I was found "not guilty" of both the August 2009 and November
> 19, 2009 incidents, yet despite my clear and convincing evidence
> to the contrary, was found "guilty" of the November 5, 2009 and
> July 11, 2009 incidents.  Based on these disciplinary charges, I
> was docked two (2) days of accrued annual leave and lost
> resulting pay.[47]

Additionally, on April 21, 2010, after Dingle sent an email to Knapp which

discussed Dingle's difficulties with Gadson relating to a request that he made on

November 4, 2009, for maintenance materials, Dingle alleges that Gadson

> sent a defamatory email to [Dingle] with a cc to all NYCHA
> supervisory personnel including Mr. Knapp, Mr. Ginsberg and
> Ms. Teri Dawson, stating in a bold large font type that [he] was
> "incompeten[t]," "failed to perform [his] duties," that [he] needed

---

[45]    Answer at 19-20.

[46]    Dingle Aff. ¶ 13.

[47]    *Id.* ¶ 14.

to "reevaluate [his] responsibilities as a superintendent" . . . .[48]

## III.   APPLICABLE LAW

### A.   Rule 12(c) Judgment on the Pleadings

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial.[49]  A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law.[50]

"'The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim.'"[51]  In either instance, the court must accept as true the non-movant's allegations, along with the allegations in the movant's pleading that the non-movant has admitted, and must draw all reasonable inferences in the non-movant's

---

[48]     *Id.* ¶ 17.

[49]     *See* Fed. R. Civ. P. 12(c).

[50]     *See Burns Int'l Sec. Servs. v. International Union, United Plant Guard Workers of Am.*, 47 F.3d 14, 16 (2d Cir. 1994); *Carballo ex rel. Cortes v. Apfel*, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).

[51]     *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 450 (S.D.N.Y. 2009) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006)).

favor.[52]  The court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[53]

The allegations in a complaint must meet a standard of "plausibility."[54]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]."[55]  Plausibility "is not akin to a probability requirement;" rather plausibility requires "more than a sheer possibility . . . ."[56]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[57]

The court "must limit itself to the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."[58]  A document is considered incorporated by reference if it is "in a

---

[52]     See id.

[53]     In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[54]     Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 564 (2007).

[55]     Ashcroft v. Iqbal, — U.S. —, —, 129 S.Ct. 1937, 1949 (2009) (quotation marks omitted).

[56]     Id. (quotation marks omitted).

[57]     Id. (quotation marks omitted).

[58]     Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

-12-

pleading . . . adopted by reference elsewhere in the same pleading or in any other pleading . . . ."[59] A court may also consider a document not specifically incorporated by reference but on which the complaint heavily relies and which is integral to the complaint.[60]

## B.    Section 1983

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[61] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[62]

### 1.    First Amendment Retaliation

To establish a retaliation claim in violation of the First Amendment right to free speech, a plaintiff must show *first*, that the speech at issue was

---

[59]    Fed. R. Civ. P. 10(c).

[60]    *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[61]    *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[62]    *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

protected; *second*, that he suffered an adverse employment action; and *third*, that

there exists a causal connection between the protected speech and the adverse

employment action.[63]  With respect to the first prong, the Supreme Court has made

clear that "public employees do not surrender all of their First Amendment rights

by reason of their employment."[64]  "Whether public employee speech is protected

from retaliation under the First Amendment entails two inquiries: (1) 'whether the

employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether

the relevant government entity had an adequate justification for treating the

employee differently from any other member of the general public.'"[65]

       The Supreme Court has stated that when a public employee makes

statements pursuant to his official duties, he does not speak as a citizen for First

Amendment purposes.[66]  Accordingly, "the Constitution does not insulate [an

employee's] communications from employer discipline" based on the employer's

---

[63]    *See Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).

[64]    *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

[65]    *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008)
(quoting *Garcetti*, 547 U.S. at 417).

[66]    *See Garcetti*, 547 U.S. at 421 ("We hold that when public employees
make statements pursuant to their official duties, the employees are not speaking as
citizens for First Amendment purposes, and the Constitution does not insulate their
communications from employer discipline.").

-14-

reaction to the speech.[67]  Thus, "[r]estricting speech that owes its existence to a

public employee's professional responsibilities does not infringe any liberties the

employee might have enjoyed as a private citizen."[68]  The Supreme Court rejected

the "notion that the First Amendment shields from discipline the expressions

[public] employees make pursuant to their professional duties."[69]  Moreover, the

Second Circuit has ruled that "speech can be 'pursuant to' a public employee's

official job duties even though it is not required by, or included in, the employee's

job description, or in response to a request by the employer."[70]

"Employee expression is not a matter of public concern when it

'cannot be fairly considered as relating to any matter of political, social, or other

concern to the community.'"[71]  "'[W]hen a public employee speaks not as a citizen

upon matters of public concern, but instead as an employee upon matters only of

personal interest, absent the most unusual circumstances, a federal court is not the

---

[67]     *Id.*

[68]     *Id.* at 421-22 ("Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job").

[69]     *Id.* at 426.

[70]     *Weintraub v. Board of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 203 (2d Cir. 2010).

[71]     *Singh*, 524 F.3d at 372 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

-15-

appropriate forum in which to review the wisdom of a personnel decision.'"[72] "In

making its determination, the court should focus on the motive of the speaker, and

attempt to discern whether the speech was calculated to redress personal grievances

or whether it had a broader public purpose."[73]

        If an employee spoke as a citizen on a matter of public concern, a First

Amendment claim may, but does not automatically, arise.  The next question is

"whether the relevant government entity had an adequate justification for treating

the employee differently from any other member of the general public."[74]

> This consideration reflects the importance of the relationship
> between the speaker's expressions and employment.  A
> government entity has broader discretion to restrict speech when
> it acts in its role as employer, but the restrictions it imposes must
> be directed at speech that has some potential to affect the entity's
> operations.[75]

"So long as employees are speaking as citizens about matters of public concern,

they must face only those speech restrictions that are necessary for their employers

to operate efficiently and effectively."[76]

---

[72]    *Id.* (quoting *Connick*, 461 U.S. at 147).

[73]    *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722
(S.D.N.Y. 2005).

[74]    *Garcetti*, 547 U.S. at 418.

[75]    *Id.*

[76]    *Id.* at 419.

## 2.   Due Process Liberty Interest

Pursuant to the Due Process Clause of the Fourteenth Amendment, a

state may not deprive an individual of liberty or property without due process of

law.[77]  In order to prevail on a procedural due process claim, a plaintiff must

identify a constitutionally protected liberty or property interest and demonstrate

that the state has deprived him of that interest without due process of law.[78]

It is well established that damage to one's reputation is not "by itself

sufficient to invoke the procedural protection of the Due Process Clause."[79]  As the

Supreme Court stated in *Paul v. Davis*:

> While we have in a number of our prior cases pointed out the
> frequently drastic effect of the "stigma" which may result from
> defamation by the government in a variety of contexts, this line of
> cases does not establish the proposition that reputation alone, apart
> from some more tangible interests such as employment, is either
> "liberty" or "property" by itself sufficient to invoke the procedural

---

[77]    *See* U.S. Const. amend. XIV.

[78]    *See Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir. 2001); *see also
Local 342 v. Town Bd. Of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994).
Dingle's alleged deprivation of a liberty interest falls under procedural due
process, although he alleges violations of substantive due process. *See* Compl. ¶
106 ("Defendants . . . violated Plaintiff's Constitutional rights by denying him
substantive due process by engaging in reckless, intentionally damaging behavior,
stigmatizing him and foreclosing him from pursuing other job opportunities and
publicly disclosing false allegations of Plaintiff's incompetence.").

[79]    *Paul v. Davis*, 424 U.S. 693, 701 (1976).

protection of the Due Process Clause.[80]

The Second Circuit has interpreted this to mean that "stigma plus" is required to establish a constitutional violation where reputation is the primary issue.[81]  To prevail on a "stigma plus" claim, a plaintiff must establish the following: (1) a "stigma" by showing "the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false;" (2) a "plus" by showing "a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights;"[82] and that "both 'stigma' and 'plus' are claimed to be sufficiently proximate."[83]

Establishment of a stigma requires the plaintiff to assert that the injurious remarks are false[84] and that Defendants' actions "will result in stigma, that is, in 'public opprobrium' and damage to [his] reputation."[85]  In the context of

---

[80]     *Id.*

[81]     *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).  *Accord Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994).

[82]     *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quotation marks omitted).

[83]     *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2004).

[84]     *See Vega*, 596 F.3d at 82 (citing *Codd v. Velger*, 429 U.S. 624 (1977)).

[85]     *Valmonte*, 18 F.3d at 999.  *Accord Velez*, 401 F.3d at 87 ("The defamatory statement must be sufficiently public to create or threaten a stigma;

job performance, the remarks must "'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his . . . profession.'"[86]  A statement that an employee merely performed a job poorly or acted in an improper manner is not sufficient.[87]  Statements that "describe problems within the employee's power to correct" are not stigmatizing.[88]

To establish the "plus", a plaintiff cannot rely merely on "'the deleterious effects which flow directly from a sullied reputation'" such as "the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."[89]  Although "it is not entirely clear what the 'plus' is,"[90] the Second

---

hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest.").

[86]    *Segal v. City of New York*, 459 F.3d 207, 212 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996)).

[87]    *See O'Neill v. City of Auburn*, 23 F.3d 685, 692 (2d Cir. 1992) ("An accusation that a licensed professional is incompetent is 'considerably graver' . . . than a statement that the individual performed a job poorly").

[88]    *Id.*

[89]    *Valmonte*, 18 F.3d at 1001. *Accord Siegert v. Gilley*, 500 U.S. 226, 234 (1991) ("Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation.  But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a

Circuit has made the standard less ambiguous by determining that the "plus" is

satisfied by deprivation of the plaintiff's property or termination of the plaintiff's

government job or some other right or status.[91]

A sufficiently proximate relationship between the "stigma" and the

"plus"

> will be satisfied where (1) the stigma and plus would, to a
> reasonable observer, appear connected — for example, due to
> their order of occurrence, or their origin — and (2) the actor
> imposing the plus adopted (explicitly or implicitly) those
> statements in doing so. There is no rigid requirement, therefore,
> that both the "stigma" and the "plus" must issue from the same
> government actor or at the same time.[92]

### 3.    Qualified Immunity

Government officials performing discretionary functions are generally

granted qualified immunity and are immune from suit provided that "'their conduct

does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"[93] "[A] qualified immunity defense can be

---

*Bivens* action.").

[90]    *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989). *Accord Sadallah*, 383 F.3d at 38.

[91]    *See Sadallah*, 383 F.3d at 38.

[92]    *Velez*, 401 F.3d at 89.

[93]    *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)).

presented in a [motion to dismiss], but . . . the defense faces a formidable hurdle when advanced on such a motion."[94]

### 4.    Municipal Liability

For a person deprived of a constitutional right to have recourse against a municipality under section 1983, he or she must show harm that results from a municipal "policy" or "custom."[95]  For a municipality's failure to train or supervise to constitute a "policy or custom" actionable under section 1983, a plaintiff must establish that the municipality's failure to train reveals a "'deliberate indifference'" to the citizen's rights.[96]

The Second Circuit set out three requirements that must be met for failure to train or supervise to be considered deliberate indifference:

> First, the plaintiff must show that a policymaker knows "to a moral certainty" that her employees will confront a given situation . . . .  Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation . . . . [Third,] the plaintiff must show that the wrong choice by the city employee

---

[94]    *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004).

[95]    *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  *Accord Board of County Comm'rs v. Brown*, 520 U.S. 397, 402 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81 (1986).

[96]    *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

-21-

will frequently cause the deprivation of a citizen's constitutional rights.[97]

Additionally, plaintiffs must offer facts showing a causal relationship between the inadequacies of the training program and the alleged constitutional violations.[98]

## C.    New York State Claim Requirements

Section 50-i of the New York General Municipal Law provides that no tort action shall be prosecuted or maintained against a municipality or any of its officers, agents, or employees unless: (1) a Notice of Claim has been served against the municipality; (2) the municipality has refused adjustment or payment of the claim; and (3) the action is commenced within one year and ninety days after the event upon which the claim is based occurred.[99]  Section 50-e requires that the Notice of Claim be filed "within ninety days after the claim arises."[100]

Section 157 of the New York Public Housing Law ("section 157") states specifically that

> [i]n every action . . . against an authority . . . , the complaint or necessary moving papers shall contain an allegation that at least

---

[97]     *Walker v. City of New York*, 974 F.2d 293, 297-298 (2d Cir. 1992).

[98]     *See Amnesty America v. Town of West Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (citing *Harris*, 489 U.S. at 391).

[99]     *See* N.Y. Gen. Mun. Law § 50-i.

[100]    *Id.* § 50-e(a).

-22-

> thirty days have elapsed since the demand, claim or claims upon
> which such action . . . is founded were presented to the authority
> for adjustment and that it has neglected or refused to make an
> adjustment or payment thereof for thirty days after such
> presentment.[101]

Section 157 further states that

> [a]n action against an authority . . . for damages for personal
> injuries, alleged to have been sustained by reason of the
> negligence of, or by the creation or maintenance of a nuisance by
> said authority, or any member, officer, agent or employee thereof,
> shall be commenced within one year and ninety days after the
> cause of action therefor shall have accrued, provided that a notice
> of the intention to commence such action shall have been served
> upon the authority. *All the provisions of section fifty-e of the
> general municipal law shall apply to such notice.*[102]

New York's notice of claim requirements are not applicable to section

1983 claims brought in federal court.[103]   However, the requirements do apply to

state law personal injury claims that are brought in federal court.[104]   Actions

---

[101]   N.Y. Pub. Hous. Law § 157(1).

[102]   *Id.* § 157(2) (emphasis added).

[103]   *See Day v. Moscow*, 955 F.2d 807, 814 (2d Cir. 1992). *Accord
Horvath v. Daniel*, No. 04 Civ. 9207, 2006 WL 47683, at *3 (S.D.N.Y. Jan. 9,
2006) ("Courts in this Circuit have repeatedly held that the notice of claim
requirement is not applicable to federal claims under section 1983.").

[104]   *See, e.g., Shakur v. McGrath*, 517 F.2d 983, 985 (2d Cir.1975)
(dismissing state malpractice claims that were added to a section 1983 complaint
nine months after the complaint was filed because state notice of claim
requirements were not satisfied). *See also Horvath v. Daniel*, No. 04 Civ. 9207,
2006 WL 950404, at *3 (S.D.N.Y. Apr. 7, 2006) ("Although we retain jurisdiction

brought under section 75-b of the Civil Service Law of New York must also comply with the Notice of Claim requirements.[105] Federal courts do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim.[106]

## D.     Amendments to Pleadings

"Rule 15(a) provides that, other than amendments as a matter of course, 'a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'"[107]   "[W]hether to permit a plaintiff to amend its pleadings is a matter

---

over plaintiff's [section] 1983 action, we lack authority to permit plaintiff to file a late Notice of Claim and therefore dismiss plaintiff's state law claims without prejudice.").

[105]     *See Donas v. City of New York*, 878 N.Y.S.2d 360, 360 (1st Dep't 2009). *Accord Williams v. County of Nassau*, 684 F. Supp. 2d 268, 295 (E.D.N.Y. 2010) ("There is no dispute here that plaintiffs failed to file a notice of claim with respect to their Section 75-b claims.")

[106]     *See Gibson v. Commissioner of Mental Health*, No. 04 Civ. 4350, 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006); *Brown v. Metropolitan Transp. Auth.*, 717 F. Supp. 257, 260 (S.D.N.Y.1989) ("Until the state legislature amends § 50-e(7) to include federal trial courts, we have no choice but to dismiss for lack of jurisdiction plaintiff's application to file a late notice of claim or to have his notice of claim deemed timely filed.").

[107]     *Slayton v. American Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006) (quoting Fed. R. Civ. P. 15(a)).

-24-

committed to the Court's sound discretion."[108]  According to the Supreme Court

> [i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be "freely given."[109]

Therefore, "'[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'"[110]

## IV.   DISCUSSION

### A.   Federal Claims

#### 1.   Dingle Has Sufficiently Pled First Amendment Retaliation

##### a.   Dingle Engaged in Protected Speech

The crux of the parties' dispute on Dingle's First Amendment

---

[108]   *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quotation marks and citation omitted).

[109]   *Foman v. Davis*, 371 U.S. 178, 182 (1962).  *Accord Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

[110]   *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).  *Accord Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

retaliation claim relates to whether Dingle engaged in protected speech. For purposes of the instant motion, Dingle has adequately pled that he "spoke as a citizen on a matter of public concern"[111] and consequently satisfied the first prong of the protected speech test. Dingle repeatedly contends that his speech constituted complaints about the "chronic understaffing of the Polo Grounds [that] posed a danger to the health and safety of residents."[112] Although Dingle does not mention specific instances of health and safety problems within the Polo Grounds, it is certainly plausible that, because NYCHA employees are responsible for taking care of problems such as "leaking pipes, broken locks, defaced walls, and cracked flooring,"[113] understaffing may lead to an unsafe environment for many residents of the Polo Grounds.

Additionally, Dingle contends that his "discussion of Gadson's failure to comport her behavior with [NYCHA] policies and procedures and the misuse of power by [NYCHA] administration . . . is protected under the First Amendment as speech by a public employee on matters of public concern."[114] Gadson's

---

[111]    *Ruotolo*, 514 F.3d at 188.

[112]    Compl. ¶ 24.

[113]    *Id.* ¶ 15.

[114]    *Id.* ¶ 96.

violations, as alleged, are directly related to the public interest, as they concern the well-being of Polo Grounds residents.  Dingle states that, in allegedly generating false "gas leak" reports and entering potentially occupied apartments without authorization, Gadson jeopardized  "the health and safety of the public who may be subjected to dangerous situations in the event that such an entry leads to the use of guns [sic] etc."[115]

Defendants argue that Dingle's remarks were "made in furtherance of [his] job duties because they were part and parcel of his concerns about his ability to properly perform his job as a Superintendent and therefore do not have First Amendment Protection."[116]  Defendants further argue that the Complaint makes clear that Dingle's remarks about understaffing were related to his employment and professional duties.[117]  However, the Supreme Court has held that a public employee's speech is unprotected if it relates to "matters *only* of personal interest."[118]  Because Dingle's speech about the understaffing problem relates to

---

[115]     *Id.* ¶ 63.

[116]     Opp. Mem. at 11 (citing *Weintraub*, 593 F.3d at 202-04).

[117]     *See* Compl. ¶ 16 (Dingle's first mention of the understaffing problem was made while he was complaining about "the over burdensome workload Gadson was requiring Mr. Dingle to do").

[118]     *Connick*, 461 U.S. at 147 (emphasis added).

matters of public concern, it is protected, regardless of whether Dingle's personal interest is also at stake.

The second prong of the protected speech test — "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public"[119] — is not disputed by the parties.[120]  In suppressing Dingle's speech, Defendants are not serving their interests in operating efficiently or effectively.  Essentially, Dingle's speech was not a threat to the Defendants' operations.

### b.   Dingle Suffered an Adverse Employment Action[121]

Dingle has offered sufficient facts to support his allegation that he suffered adverse employment actions.  In *Zelnick v. Fashion Institute of Technology*, the Second Circuit established that

> [i]n the context of a First Amendment retaliation claim, we have held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.  In this context, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. This list of retaliatory conduct is certainly not exhaustive,

---

[119]    *Ruotolo*, 514 F.3d 188.

[120]    *See* Opp. Mem. at 10.

[121]    Defendants do not contest that Dingle suffered adverse employment actions.  *See id.*

> however, and lesser actions may also be considered adverse
> employment actions. Adverse employment actions may include
> negative evaluation letters . . . .[122]

Dingle alleges that he was subjected to adverse employment actions including

numerous counseling memoranda, unequal treatment, verbal harassment, and an

increased workload.[123]

### c. Dingle Has Pled a Causal Connection Between His Speech and the Adverse Employment Action[124]

Dingle has also sufficiently alleged a causal connection between his

speech and the adverse employment actions. Although temporal proximity is

strong circumstantial evidence of improper intent,[125] because Dingle frequently

engaged in the protected speech for a several-year period — not only before the

adverse employment actions — this Court's ability to infer causation solely based

on a temporal connection is weakened.[126]

---

[122]   464 F.3d 217, 225-26 (2d Cir. 2006) (quotation marks, citations, and brackets omitted).

[123]   *See supra* notes 17-23, 37-38 and accompanying text.

[124]   Defendants do not contest that Dingle has pled a causal connection between his speech and the adverse employment action. *See* Opp. Mem. at 10.

[125]   *See Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).

[126]   See *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999).

Nevertheless, causation is sufficient because Dingle alleges specific connections between his speech and adverse employment actions.  For example, immediately after a meeting concerning Dingle's complaints among Knapp, Gadson, and Dingle on September 20, 2007, Gadson "approached Itzkowitz and demanded that a Counseling Memo be reissued against Mr. Dingle that had been issued the week before."[127]

### 2.  Dingle's Due Process Liberty Interest in Freedom from Defamation Claim Is Dismissed

Because Dingle does not adequately plead a violation of his due process liberty interest in freedom from defamation, this claim is dismissed with prejudice.  Dingle alleges, in general terms, that Defendants "engag[ed] in reckless, intentionally damaging behavior, stigmatizing him and foreclosing him from pursuing other job opportunities and publicly disclosing false allegations of Plaintiff's incompetence."[128]

To sufficiently plead a stigma plus claim, the stigmatizing remarks must be specifically alleged to be false.  Dingle only points to three instances of false public statements — two counseling memoranda (one of which was later

---

[127]  Compl. ¶ 29.

[128]  *Id.* ¶ 106.

rescinded) and one email sent to several NYCHA administrators.[129]  These

statements, however, cannot be considered "sufficiently derogatory to injure"

Dingle's reputation,"[130] as they described Dingle as "perform[ing] a job poorly."

As a matter of law, such statements are not considered to be stigmatizing.[131]

Even if these allegations did meet the "stigma" requirement, a stigma

plus claim is still not sufficiently stated because Dingle does not satisfy the "plus"

requirement.  Dingle does not provide a factual basis for his allegation that

Defendants foreclosed him from "pursuing other job opportunities."[132]  Dingle

additionally alleges that the false statements arising from the July 11, 2009 incident

led to a Local Hearing, at which Dingle received a disciplinary charge resulting in

the loss of two days accrued leave.[133]  This loss cannot be considered a violation of

procedural due process because Dingle does not dispute the fairness of the

---

[129]     *See id.* ¶¶ 69(m), 69(n), 74.  In his Affidavit, Dingle alleges that he
received a counseling memorandum in connection with this email.  *See* Dingle Aff.
¶¶ 8-9.

[130]     *Vega*, 596 F.3d at 81.

[131]     *See O'Neill*, 23 F.3d at 692.

[132]     Compl. ¶ 106.

[133]     *See* Dingle Aff. ¶ 14.

hearing.[134]

It must be noted that Dingle alleges that "Gadson's treatment . . . is ongoing and continuous to the present."[135]  Accordingly, in his Affidavit, Dingle alleges that on April 21, 2010,

> Gadson sent a defamatory email to me with a cc to all NYCHA supervisory personnel including Mr. Knapp, Mr. Ginsberg, and Ms. Teri Dawson, stating in a bold large font type that I was "incompetent[t]," "failed to perform my duties," that I needed to "reevaluate my responsibilities as a superintendent" and refused to accept any responsibility for failing to answer my request for funds.[136]

Unlike the allegedly false statements in the Complaint, this email carries the potential to meet the "stigma" standard.[137]  Nevertheless, Dingle does not allege any sort of corresponding harm from this email that would satisfy the "plus" requirement.  As such, this claim is dismissed with prejudice.[138]

---

[134]    See Martuciello v. Ward, No. 87 Civ. 1709, 1988 WL 3490, at *4 (S.D.N.Y. Jan. 11, 1988).

[135]    Compl. ¶ 92.

[136]    Dingle Aff. ¶ 17.

[137]    See O'Neill, 23 F.3d at 692.

[138]    There is no additional substantive information Dingle could offer to satisfy the "plus" requirement.  Granting him the opportunity to replead this claim would therefore be futile.  See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).

### 3.    Defenses to the Section 1983 Claim

#### a.    Gadson Is Not Protected by Qualified Immunity

Defendants do not assert that Gadson is entitled to qualified immunity

with regard to the First Amendment retaliation claim.  They do argue, however,

that "[t]he deprivation of liberty interest claim should . . . be dismissed as against

Gadson, in her individual capacity, on the ground that Gadson is protected by

qualified immunity."[139]  Because Dingle's deprivation of liberty interest claim has

been dismissed with prejudice, this argument is moot.

#### b.    The Municipal Liability Against the NYCHA Is Dismissed

Dingle alleges that "Defendants did knowingly, recklessly, or with

gross negligence fail to instruct, supervise, control, and discipline on a continuing

basis Defendant Gadson in her duties to refrain from unlawfully and maliciously

retaliating against Plaintiff for engaging in protected activities."[140]  However,

Dingle does not sufficiently allege "deliberate indifference" on behalf of the

NYCHA.[141]  When Dingle complained to his supervisors about Gadson, his

complaints were not ignored — supervisors answered Dingle's emails and held

---

[139]    Def. Mem. at 17.

[140]    Compl. ¶ 100.

[141]    *Jenkins*, 478 F.3d at 94.

meetings in response to his complaints.[142]

The only alleged instances that demonstrate the NYCHA's indifference are when Dingle never heard back regarding a complaint filed with the NYCHA's Inspector General's office on June 30, 2009,[143] and when Knapp refused to meet with Dingle's union representative in August 2009, regarding the conflict between Dingle and Gadson.[144]  Dingle additionally alleges that Joseph Porcelli, a Borough Administrator, was aware of Gadson's First Amendment retaliation and did nothing to stop it — "[i]n the context of [a] stream of emails going back and forth by and between Gadson and Porcelli and Mr. Dingle during this time, it was clear to Porcelli that Mr. Dingle was complaining about Gadson's retaliation against him . . . ."[145]  But these three examples of inaction do not indicate a "discriminatory practice . . . so manifest as to imply the constructive acquiescence of senior policy-making officials."[146]  Dingle's "failure to train or supervise"

---

[142]   *See* Compl. ¶¶ 18, 27, 42.

[143]   *See id.* ¶ 68.

[144]   *See id.* ¶ 79.

[145]   *Id.* ¶ 39.

[146]   *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992).  Dingle does not allege that Knapp is a senior policy-making official, but even if Knapp acts in this capacity, his refusal to meet with a union representative on one occasion cannot be characterized as a "persistent and widespread" discriminatory practice. *Id.* at 870.

allegation also fails because Dingle does not allege any "difficult choice" or
"situation" that training or supervision would have made less difficult.[147]  Because
it appears that Dingle has carefully alleged the details of every instance of alleged
indifference, leave to amend would be futile.  Accordingly, this claim is dismissed
with prejudice.

## B.     The State Law Claims Are Dismissed

Defendants argue that Dingle's state law claims — defamation and a
whistleblower claim under section 75-b — should be dismissed because Dingle
failed to comply with the pleading requirements set forth by section 157.[148]
Section 157 applies to Dingle's state law claims against the NYCHA because the
statute discusses claims "against an authority."[149]  It also applies to Dingle's claims
against Gadson, however, because Gadson is an employee of the NYCHA — a
public corporation.[150]

---

[147]     *Walker*, 974 F.2d at 297.

[148]     *See* Reply Memorandum of Law of Defendants in Support of Their
Motion for Judgment on the Pleadings at 18, 22.

[149]     N.Y. Pub. Hous. Law § 157.

[150]     *See* N.Y. Gen. Mun. Law § 50-e(a) ("[A] notice of claim is required
by law as a condition precedent to the commencement of an action or special
proceeding against a public corporation, as defined in the general construction law,
or any officer, appointee or employee thereof . . . ."). It is well settled that the
NYCHA is a public corporation. *See Barnes v. New York City Hous. Auth.*, 691

Although Dingle eventually filed a Notice of Claim on June 10, 2010,[151] it is beyond cavil that he did not meet the statutory pleading requirements at the time of filing. "The purpose of the notice of claim requirement is to afford the municipality an adequate opportunity to investigate the claim in a timely and efficient manner and, where appropriate, to settle claims without the expense and risks of litigation."[152] By filing a Notice of Claim midway through the pleadings, Dingle did not satisfy these purposes. He therefore failed to comply with New York State's statutory requirements.

Dingle's state claims are dismissed for failure to timely file notice of claim without prejudice. Because this Court cannot grant permission to file a late Notice of Claim,[153] Dingle must pursue his state claims in state court.

---

N.Y.S.2d 463, 464 (1st Dep't 1999); *Nachowitz v. New York City Hous. Auth.*, 467 N.Y.S.2d 386, 386 (1st Dep't 1983) ("New York City Housing Authority is a public corporation").

[151]    Notice of Claim, Ex. A to Opp. Mem., at 3. The actual document is signed and dated "June 10, 2006 ", but notarized with the date "June 10, 2010 ". Presumably, the 2006 date is a typographical error.

[152]    *McLaurin v. New Rochelle Police Officers*, 368 F. Supp. 2d 289, 296 (S.D.N.Y. 2005) (citing *Brown v. New York City Transit Auth.*, 568 N.Y.S.2d 54, 55 (1st Dep't 1991)).

[153]    *See Gibson*, 2006 WL 1234971, at *5.

-36-

## V.    CONCLUSION

For the reasons stated above, Defendants' motion for judgment on the pleadings is granted in part and denied in part. The Clerk of the Court is directed to close this motion (Docket No. 15). A conference is scheduled for October 13, 2010, at 4:30 p.m., in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              July 28, 2010

## - Appearances -

**For Plaintiff:**

Michael J. Borrelli, Esq.
Eric Z. Reimer, Esq.
Borrelli & Associates, P.L.L.C.
One Old Country Road
Suite 347
Carle Place, New York 11514
(516) 248-5550

**For Defendants:**

Jeffrey M. Niederhoffer, Esq.
Sonya M. Kaloyanides, Esq.
New York City Housing Authority Law Department
250 Broadway
9th Floor
New York, New York 10007
(212) 776-5259