UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

ANTHONY DINGLE,

          **Plaintiff,**

   - against -

THE CITY OF NEW YORK,
THE NEW YORK CITY HOUSING
AUTHORITY, and
DEMETRICE GADSON, in her individual
capacity,

          **Defendants.**

-----------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 4 (SAS)**



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       In January 2010, Anthony Dingle filed this action against his

employer the New York City Housing Authority ("NYCHA"), and his supervisor,

Demetrice Gadson, for claims arising under section 1983 of Title 42 of the United

States Code ("section 1983"), state common law, and section 75-b of the Civil

Service Law of New York ("section 75-b").[1] In May 2010, defendants moved for

---

[1]     On February 4, 2010, Dingle withdrew his claims against the City of
New York. *See* Stipulation of Dismissal for Defendant the City of New York
(Docket No. 5). Dingle originally brought claims under sections 740 and 741 of the
New York Labor Law. *See* Complaint ¶¶ 109-113. He has since abandoned these

judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  I granted defendants' motion as to all of plaintiff's causes of action, except his First Amendment retaliation claim against Gadson in her individual capacity.[2] Defendant Gadson now moves for summary judgment.  For the reasons stated below, defendant's motion is granted in part and denied in part.

## II.    BACKGROUND

Plaintiff commenced employment with NYCHA in July 1990.[3]  He became a superintendent in 2004, and first met Demetrice Gadson, a deputy director in NYCHA's Manhattan Management Department, when he began reporting indirectly to her in 2006.[4]  In early 2007, plaintiff became superintendent at a NYCHA development in Manhattan known as Polo Grounds Tower ("Polo Grounds"), where he continued to report indirectly to Gadson.[5]  As superintendent of Polo Grounds, plaintiff was responsible for monitoring, inspecting, and coordinating the operation, cleaning, and maintenance of the entire housing

─────────────────

claims.  *See* Dingle's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings at 16.

[2]       *See Dingle v. City of New York*, 728 F. Supp. 2d 332 (S.D.N.Y. 2010).

[3]       *See* Local Rule 56.1 Statement in Support of Defendant Demetrice Gadson's Motion for Summary Judgment ("Def. 56.1") ¶ 1.

[4]       *See id.* ¶¶ 7-8.

[5]       *See id.* ¶ 9.

development, including the grounds, buildings, and residential apartments.[6]

### A.    Dingle's Complaints to Supervisors and Union

On June 8, June 13, and June 20, 2007, plaintiff emailed his NYCHA supervisors, including Gadson, to address concerns about workload and deadlines, inadequate staffing at his development, and the need for overtime.[7]  On August 14, 2007, Gadson ordered plaintiff's direct supervisor to issue plaintiff a counseling memorandum for a series of incidents that occurred while he was "off duty on vacation,"[8] which plaintiff interpreted as retaliation for his email complaints to supervisors in June.[9]

On September 20, 2007, in a meeting with Gadson and another supervisor, plaintiff again addressed concerns about inadequate staffing, which was preventing him from performing his duties at the Polo Grounds.[10]  On October 9, 2007, Gadson issued plaintiff a counseling memorandum for his alleged failure to

---

[6]     *See id.* ¶ 5.

[7]     *See id.* ¶¶ 16-20.

[8]     Local Rule 56.1 Statement in Support of Plaintiff's Opposition to Motion for Summary Judgment ("Pl. 56.1") ¶ 20(b).

[9]     *See id.* ¶ 21.

[10]    *See* Def. 56.1 ¶ 24.

submit a report,[11] which plaintiff interpreted as retaliation for his complaints at the meeting of September 20.[12]

On numerous occasions over the next six months, similar complaints about inadequate staffing made by plaintiff to Gadson, other supervisors, and his union representatives were followed by what the plaintiff believed to be retaliatory conduct by Gadson, including numerous counseling memoranda.[13]  However, between March 2008 and March 2009, plaintiff ceased submitting complaints, and, as a result, Gadson ceased her alleged retaliatory conduct.[14]

On March 12, 2009, plaintiff emailed Gadson to request more staff to complete a repairs that Gadson assigned the previous month.[15]  On March 23, 2009 Gadson issued plaintiff a counseling memorandum for his alleged failure to complete "any" of the repairs she had assigned.[16]  However, plaintiff alleges that he

---

[11]  *See id.* ¶ 25.

[12]  *See* Pl. 56.1 ¶ 26.

[13]  *See* Def. 56.1 ¶¶ 29, 31, 33, 34, 36, 37, 40, 42, 47, 48; Pl. 56.1 ¶¶ 31, 33, 34, 36, 40, 42, 47, 48.

[14]  *See* Plaintiff's Memorandum of Law in Opposition to Defendant Gadson's Motion for Summary Judgment at 8.

[15]  *See* Def. 56.1 ¶ 52.

[16]  *See id.* ¶ 53.

completed some of the tasks.[17]  Moreover, plaintiff's direct supervisor claims the assigned tasks would have taken four months to complete with the resources provided.[18]

On May 4, 2009, while plaintiff was on a lunch break, Gadson ordered plaintiff's staff to "drill out" the locks on a NYCHA tenant's apartment without a police escort present, as required by law.[19]  When Gadson's supervisors found out, Gadson attempted to cover herself by ordering plaintiff's immediate supervisor to issue a counseling memorandum to plaintiff.[20]  In a meeting a few days later among plaintiff, his immediate supervisor, and Gadson, plaintiff complained that Gadson had previously ordered plaintiff and his staff to "drill out people's cylinders [without police escorts] and claim apartments [were] vacant if they [were] occupied."[21]  Subsequently, Gadson rescinded this counseling memorandum.[22]

### B.   Dingle's Complaints to Administrative Agencies

---

[17]    *See* Pl. 56.1 ¶ 53.

[18]    *See id*.  Gadson issued the counseling memorandum less than a month after providing the list of tasks.  *See also* Def. 56.1 ¶ 53.

[19]    *See* Pl. 56.1 ¶ 60.

[20]    *See id*.

[21]    *Id.*

[22]    *See* Def. 56.1 ¶ 60.

On May 7, 2009, plaintiff visited NYCHA's Department of Equal Opportunity ("DEO") to complain that he had been treated unfairly by Gadson; that he had been issued unwarranted counseling memoranda, including the incident involving the lock drilling; and that Gadson had given him unreasonable workloads.[23]  Plaintiff informed his direct supervisor, Kassandra Bostick, before going to the DEO.[24]  When Gadson called later that day to speak with plaintiff, Bostick informed her that plaintiff "had left Polo Ground development to go to DEO."[25]  On June 15, 2009, Gadson ordered Bostick to issue another counseling memorandum to plaintiff, even though Bostick believed it was unwarranted.[26]  Plaintiff believed Gadson issued the counseling memorandum in retaliation for filing a complaint with the DEO.[27]

On June 29, 2009, plaintiff contacted NYCHA's Office of the Inspector General ("OIG") by telephone alleging that Gadson treated him unfairly by issuing unwarranted counseling memoranda and that Gadson committed various

---

[23]   *See id.* ¶ 61; Pl. 56.1 ¶ 61.

[24]   *See* Pl. 56.1 ¶ 62.

[25]   *Id.*

[26]   *See id.* ¶ 64.

[27]   *See id.* ¶ 65.

administrative violations.[28]  On July 1, 2009, the OIG forwarded a memorandum

containing plaintiff's substantive allegations to Robert Knapp, Gadson's direct

supervisor.[29]  Gadson now alleges that she was unaware plaintiff had gone to the

OIG until he filed this action.[30]  But at her deposition, Gadson claimed that she

didn't recall whether she had known plaintiff went to the OIG.[31]  Moreover, Knapp

– Gadson's direct supervisor – stated that upon receiving a complaint against one

of his subordinates, his usual practice would be to share that information with the

subordinate involved,[32] implying that Gadson may have known on or shortly after

July 1 that plaintiff had gone to the OIG.

Regardless of whether Gadson knew of the OIG complaint, it is not

disputed that on July 2, 2009, the day after Knapp received the OIG memorandum,

Gadson served plaintiff with a Notice of Local Hearing and Specification of

Charges ("Notice of Local Hearing"), a more serious disciplinary action than a

---

[28]     *See* Def. 56.1 ¶ 66.

[29]     *See id.* ¶ 68.

[30]     *See id.* ¶ 70.

[31]     Pl. 56.1 ¶ 70.  Gadson Deposition, Ex. E to Declaration of Alexander T. Coleman, plaintiff's counsel, in Opposition to Defendant Gadson's Motion for Summary Judgment("Coleman Decl."), at 55, 170.

[32]     *See id.*  Knapp Deposition, Ex. A to Coleman Decl., at 104-05.

counseling memorandum.[33]  Although Gadson prepared the Notice on April 17, 2009, the parties dispute her motivation for filing it on July 2.[34]  Plaintiff believed Gadson was retaliating against him for contacting the OIG.[35]  On July 8, July 13, and August 26, 2009, Gadson issued counseling memoranda to plaintiff, which he believed to be further illegitimate retaliations for his complaint to the OIG.[36]

On September 10, 2009, plaintiff visited the New York City Employee Assistance Program ("EAP"), Office of Labor Relations to file complaints about Gadson's forced entries into NYCHA apartments and other administrative violations.[37]  On the same day, plaintiff informed Bostick – his direct supervisor – that he was going to the EAP, and Bostick informed Gadson.[38]  Approximately two months later, on November 12, 2009, Gadson ordered Bostick to issue plaintiff a counseling memorandum, which plaintiff believed to be undeserved and in retaliation for his complaint to the EAP.[39]  On November 20,

---

[33]     *See* Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72.

[34]     *See id.*

[35]     *See* Pl. 56.1 ¶ 72

[36]     *See* Def. 56.1 ¶¶ 76, 78, 79, 80, 81; Pl. 56.1 ¶¶ 76, 78, 79, 80, 81.

[37]     *See* Pl. 56.1 ¶ 82.

[38]     *See id*.

[39]     *See id. ¶¶* 86, 87.

2009, Gadson issued a counseling memorandum for plaintiff's allegedly loud, profane, abusive, and threatening behavior toward Gadson during a meeting involving plaintiff, Gadson, and other supervisors.[40]   However, in her affidavit, Bostick recounts that it was Gadson who was condescending and loud at the meeting, and that plaintiff was never threatening or profane toward Gadson.[41] Plaintiff believes this too was a retaliatory counseling memorandum for his complaints against her.[42]

Finally, plaintiff served the Complaint in this case on Gadson on January 21, 2010.[43]   Approximately two weeks later, Gadson served on plaintiff an additional Notice of Local Hearing containing five new charges not addressed in the first Notice of Local Hearing.[44]

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[40]   *See* Def. 56.1 ¶ 88.

[41]   *See* Pl. 56.1 ¶ 88.  Bostick Affidavit, Ex. C to Coleman Decl., at ¶ 39.

[42]   *See* Pl. 56.1 ¶ 89.

[43]   *See* Def. 56.1 ¶ 92.

[44]   *See* Pl. 56.1 ¶ 75.

party is entitled to judgment as a matter of law."[45]  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"[46]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[47]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[48]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[49] and

---

[45]     Fed. R. Civ. P. 56(c).

[46]     *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[47]     *Miner v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008).  *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[48]     *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks and citations omitted).

[49]     *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"'may not rely on conclusory allegations or unsubstantiated speculation.'"[50] However, "'all that is required [from the non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[51]

"In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party."[52] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[53]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[54]

## IV.   APPLICABLE LAW

### A.   Section 1983 First Amendment Retaliation

---

[50]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[51]     *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248-49).

[52]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 242, 255).

[53]     *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

[54]     *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).  *Accord Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[55]  In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[56]

To survive summary judgment on a First Amendment retaliation claim, a public employee must bring forth evidence showing: (1) he has engaged in protected First Amendment activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action.[57]  "If a plaintiff makes a sufficient showing of each of these elements, summary judgment is not appropriate unless the defendant establishes as a matter of law that [s]he would have taken the same adverse employment action even absent the protected conduct."[58]

---

[55]     *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 159 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

[56]     *See Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004).

[57]     *See Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (citing *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007)).

[58]     *Dillon*, 497 F.3d at 251.

### 1.    Protected Speech

Public employee speech is protected from retaliation under the First Amendment only where (i) the employee spoke as a citizen, rather than pursuant to official duties, and (ii) the employee spoke on a matter of public concern.[59]

### i.    Speaking As a Citizen

"When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."[60]  The Second Circuit has ruled that "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer."[61] "[W]hether a public employee spoke 'pursuant to' his or her official duties is a practical one."[62]  The court is to look beyond "formal job descriptions" to

---

[59]    *See Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009) ("If the court determines that the plaintiff either did not speak as a citizen *or* did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'") (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)) (emphasis added).

[60]    *Garcetti*, 547 U.S. at 421.

[61]    *Weintraub v. Board of Educ. of the City Sch. Dist. of the City of New York*, 593 F.3d 196, 203 (2d Cir. 2010), *cert. denied,* 131 S. Ct. 444 (2010).

[62]    *Id.* at 202 (quoting *Garcetti*, 547 U.S. at 424).

determine if the speech was "part of what [plaintiff] was employed to do," by looking to whether the speech "owes its existence to [the] public employee's professional responsibilities."[63]  Under the Second Circuit's decision in *Weintraub v. Board of Education*, a court must look to whether an employee's speech could be viewed as "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties."[64]  Speech that has no "'relevant analogue to speech by citizens who are not government employees'" likely falls within the employee's official duties.[65]  For example, the Second Circuit specifically noted that "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general."[66]

### ii.    On a Matter of Public Concern

Whether an employee's speech addresses a matter of public concern is

---

[63]    *Garcetti*, 547 U.S. at 421.

[64]    *Weintraub*, 593 F.3d at 203.  *See also Burhans v. County of Putnam*, No. 06 Civ. 8325, 2011 WL 1157693, at *4 (S.D.N.Y. Mar. 25, 2011) ("'Without more,' an employee's speech pursuant to his official duties is not 'transform[ed]' into the speech of a 'private citizen' just because an employee has 'persist[ed] in such speech after a supervisor has told him to stop.'") (quoting *Anemone*, 629 F.3d at 116).

[65]    *Weintraub*, 593 F.3d at 203-04 (quoting *Garcetti*, 547 U.S. at 424).

[66]    *Id.* at 204.

a question of law to be determined based on the "content, form and context of a given statement, as revealed by the whole record."[67]  An "[e]mployee expression is not a matter of public concern when it 'cannot be fairly considered as relating to any matter of political, social, or other concern to the community.'"[68]  "'[W]hen a public employee speaks . . . *only* of personal interest, absent the most unusual circumstances,'" that speech is not a matter of public concern.[69]

### 2.   Adverse Employment Action

"[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'"[70]  "Such adverse employment actions in the First Amendment retaliation context include 'discharge, refusal to hire, refusal to

---

[67]   *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) (citing *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

[68]   *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008) (quoting *Connick*, 461 U.S. at 146).

[69]   *Id*. (quoting *Connick*, 461 U.S. at 147).  Thus, speech may address a matter of public concern while also addressing an employee's personal interest. *See Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010) (stating that this Circuit has "rejected a categorical approach that places all speech aimed at redressing personal grievances in the employment context beyond the scope of the First Amendment").

[70]   *Dillon*, 497 F.3d at 254 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)).

15

promote, demotion, reduction in pay, and reprimand.'"[71]  "This list of retaliatory conduct is certainly not exhaustive, however, and lesser actions may also be considered adverse employment actions."[72]  "Likewise, the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision."[73]  The alleged act of retaliation, however, must be "more than de minimis."[74]

### 3. Causal Connection Between Protected Speech and Adverse Employment Action

"To establish causation [in a First Amendment retaliation action], a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.'"[75]  "In this Circuit, a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment]

---

[71]    *Gangadeen v. City of New York*, 654 F. Supp. 2d 169, 183 (S.D.N.Y. 2009) (quoting *Zelnik*, 464 F.3d at 226).

[72]    *Zelnik,* 464 F.3d at 226.

[73]    *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

[74]    *Zelnik*, 464 F.3d at 226.

[75]    *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 167-68 (2d Cir. 2006) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).

16

action."[76]  "Temporal proximity is strong circumstantial evidence of improper

intent."[77]  Moreover, there is no bright line for how close in time the adverse

employment action must follow the protected activity in order to sustain the

causation element on a summary judgment motion.[78]  "There is, however,

substantial authority holding that a period between five and six months is

sufficient."[79]  Regardless of the interval, "[s]ummary judgment is precluded where

questions regarding an employer's motive predominate in the inquiry regarding

how important a role the protected speech played in the adverse employment

decision."[80]

## V.    DISCUSSION

### A.    Dingle's Complaints to His Supervisors and Union Are Not Protected Under the First Amendment

---

[76]    *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).

[77]    *Anderson v. State of New York, Office of Court Admin. of Unified Court Sys.*, 614 F. Supp. 2d 404, 431 (S.D.N.Y. 2009) (citing *Gorman-Bakos*, 252 F.3d at 554).

[78]    *See Cioffi*, 444 F.3d at 168.

[79]    *Anderson*, 614 F. Supp. 2d at 430 (citing *Gorman-Bakos*, 252 F.3d at 555 (five months); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship); *Bolick v. Alea Group Holdings, Ltd.*, 278 F. Supp. 2d 278, 284 (D.Conn. 2003) (six months)).

[80]    *Morris*, 196 F.3d at 110.

17

Although plaintiff spoke on a matter of public concern,[81] he was not speaking "as a citizen"[82] when he voiced complaints to his supervisors and union. His speech *in those contexts* is therefore not protected from retaliation under the First Amendment.

Plaintiff's complaints to his supervisors were not made as a private citizen; rather, they were made pursuant to his official job duties as superintendent of the Polo Grounds.  Plaintiff's complaints to his supervisors addressed his workload, his performance, and the need for more staff and overtime approval to complete maintenance work in a timely manner.  Such issues, though perhaps related to a matter of public concern, are "part-and-parcel" of plaintiff's "concerns about his ability to properly execute his duties"[83] – namely, day-to-day maintenance tasks at the Polo Grounds.  Furthermore, plaintiff made these

---

[81]    As the plaintiff notes in opposition to this motion, I have already ruled that plaintiff was speaking on a matter of public concern to the extent his complaints addressed (A) danger to the health and safety of Polo Grounds residents and (B) Gadson's violations of NYCHA administrative procedures.  *See Dingle,* 728 F. Supp. 2d at 349-50.  However, that ruling was made on a motion for judgment on the pleadings.  Here, on a motion for summary judgement, where the parties may rely on evidence obtained during discovery, I am now able to distinguish the instances in which plaintiff was speaking *as a private citizen* on a matter of public concern.

[82]    *Garcetti*, 547 U.S. at 417.

[83]    *Weintraub*, 593 F.3d at 203.

18

statements as "internal communications"[84] between employee and supervisor, a channel of communication with no "'relevant analogue to speech by citizens who are not government employees.'"[85]  Because the record demonstrates that Dingle's speech to his supervisors was not made in his role as a private citizen but rather pursuant to his role as superintendent at the Polo Grounds, defendant's motion for summary judgment is granted as to plaintiff's retaliation claims arising from communications with his NYCHA supervisors.

Likewise, plaintiff was not speaking as a private citizen in communications with his union representative.  The Second Circuit has expressly stated that "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens."[86]  Defendant's motion for summary judgement is therefore granted as to plaintiff's retaliation claims arising from communications with his union.

**B.    Dingle's Communications with Administrative Agencies Are Protected Under the First Amendment**

On the other hand, communications with administrative agencies,

---

[84]    *Id.* at 204.

[85]    *Id.* at 203-04 (quoting *Garcetti*, 547 U.S. at 424).

[86]    *Id.*

including the DEO, OIG, and EAP,[87] are channels of discourse generally available to private citizens.  These administrative agencies are precisely where a private citizen, such as a tenant of the Polo Grounds, would report the maintenance staff's failure to service the community's needs or a violation of administrative procedures by a NYCHA supervisor.  The Second Circuit has expressly listed Offices of Inspector General as an example of a channel available to private citizens.[88]  Because plaintiff addressed matters of public concern when he visited these agencies, and because he was, in those contexts, speaking as a private citizen, plaintiff's communications with the DEO, OIG, and EAP were protected under the First Amendment.

## C.    Dingle Was Subject to Adverse Employment Actions

Plaintiff has shown that he was subject to numerous adverse employment actions.  In the Second Circuit, a counseling memorandum, as a formal, written reprimand, sufficiently deters the exercise of constitutional rights to

---

[87]    The EAP might not be available to non-employee private citizens, because it is, at least nominally, an "*Employee* Assistance Program."  However, the parties have not briefed the issue, and I need not address it here.  For the purposes of this motion, taking the facts in the light most favorable to the plaintiff, I include the EAP in the same category of administrative agencies as the DEO and OIG.

[88]    *See Weintraub*, 593 F.3d at 204.

constitute an adverse employment action.[89]  Likewise, a more serious form of discipline, such as a Notice of Local Hearing, would also suffice, since "the institution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision."[90]  Because plaintiff was subjected to counseling memoranda and Notices of Local Hearing, he has suffered adverse employment actions for purposes of a First Amendment retaliation claim.

> **D.    Whether Dingle's Protected Activities Are Causally Related to Gadson's Adverse Employment Decisions Is a Genuine Issue of Material Fact**

Plaintiff's evidence supports a reasonable inference of causation between his protected activities and Gadson's adverse employment decisions.  To indirectly establish that protected speech is a substantial motivating factor in an adverse employment action, a plaintiff may show temporal proximity between the protected speech and the adverse action.  Five weeks after visiting the DEO, Gadson ordered Bostick to issue plaintiff a counseling memorandum, even though Bostick believed it was unwarranted.  In that instance, Bostick claims she had informed Gadson of plaintiff's visit to the DEO.  Two days after visiting the OIG,

---

[89]    *See Gangadeen*, 654 F. Supp. 2d at 183 ("[A]dverse employment actions in the First Amendment retaliation context include '. . . reprimand.'") (quoting *Zelnik*, 464 F.3d at 226).

[90]    *Skehan*, 465 F.3d at 106.

Gadson's direct supervisor received notice from the OIG of plaintiff's complaints. The next day, Gadson served plaintiff with a Notice of Local Hearing.[91]  Finally, approximately two months after plaintiff visited the EAP, Gadson ordered Bostick to issue plaintiff a counseling memorandum.  In that instance, Bostick claims she had informed Gadson of plaintiff's visit to the EAP.

            In light of these facts, there is surely a material disputed issue of fact as to whether plaintiff's protected activities were substantial motivating factors in Gadson's adverse employment decisions.  All three protected activities were followed by adverse employment actions well within the five- to six-month window generally found sufficient to support a reasonable inference of causation.  Moreover, Gadson's knowledge of plaintiff's visits to these agencies is in dispute, and therefore the issue of her motivation focuses directly on the question of how important a role plaintiff's protected activities played in Gadson's adverse employment decisions.  Thus, defendant's motion for summary judgment is denied as to plaintiff's First Amendment retaliation claims arising from his visits to the

---

            [91]     Gadson claims she did not learn of plaintiff's visit to any of the agencies until he filed this action.  But the temporal proximity between plaintiff's protected speech and Gadson's adverse employment decisions is strong circumstantial evidence that she may have known.  In this instance, Gadson's direct supervisor acknowledges receipt of the complaint from the OIG on July 1, 2009.  Though he does not remember informing Gadson of plaintiff's complaint, it would be customary for him to do so.  As such, the record reflects a genuine issue of material fact as to Gadson's knowledge.

DEO, OIG, and EAP.

## VI.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment

is granted in part and denied in part.  The Clerk of Court is directed to close this

motion (Docket # 31).  A conference is scheduled for July 26, 2011 at 5:00 PM.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
        July 7, 2011

23

**- Appearances -**

**For Plaintiff:**

Michael John Borrelli, Esq.
Alexander Todd Coleman, Esq.
Eric Zev Reimer, Esq.
Law Offices of Borrelli & Associates
One Old Country Road, Suite 347
Carle Place, NY 11514
(516) 248-5550

**For Defendant:**

Jeffrey Marc Niederhoffer, Esq.
New York City Housing Authority Law Department
250 Broadway, 9th Floor
New York, NY 10007
(212) 776-5259